## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## "IN ADMIRALTY"

World Fuel Service (Singapore) Pte Ltd
d/b/a World Fuel Services,

      Plaintiff,

vs.

Alcyone International Marine, Inc.,

      Defendant.

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff WORLD FUEL SERVICES (SINGAPORE) PTE LTD d/b/a World Fuel Services ("WFS") hereby files its complaint against Defendant ALCYONE INTERNATIONAL MARINE INC. ("Owner").

1. This is a declaratory action and this Court has jurisdiction pursuant to 28 U.S.C. §1333 and 28 U.S.C. §2201.

2. There is an actual and present controversy between the Parties, as outlined and alleged below.

3. Plaintiff WORLD FUEL SERVICES (SINGAPORE) PTE LTD is a company organized under the laws of Singapore currently with an address at 238B Thomson Road #16-01/07 Novena Square Tower B Singapore 307685.

4. Plaintiff World Fuel Services sells and supplies fuel oil and lubricants to ocean going cargo vessels and tankers.

5.    Defendant ALCYONE INTERNATIONAL MARINE, INC., is a Liberian entity with a registered address of 80 Broad Street Monrovia (Liberia) and is the registered owner of the Motor Vessel *Gentle Seas*.

6.    The motor vessel *Gentle Seas* was time chartered by Defendant Alcyone to 24Vision Chartering Solutions DMCC, ("Charterer"), an entity organized and domiciled in the United Arab Emirates.

7.    On August 20, 2020, the Parties reached a settlement of claims stemming from the provision of bunkers to the motor vessel *Gentle Seas*. The Mutual Release and Settlement Agreement would be attached as exhibit 1 hereto, but it includes a confidentiality provision that precludes public disclosure. Nonetheless, both Parties have a copy and World Fuel Services will seek to make it available for the court's review. And a true and correct copy will be included with the Complaint to be served upon Defendant Alcyone.

8.    Pursuant to both the Mutual Release and Settlement Agreement and the underlying contract documents (Exhibits "A", "B" and "C" hereto) the Parties agreed to jurisdiction and venue in this court.

9.    Defendant Alcyone made demand for refund of the settlement funds claiming the agreement was reached under duress. *See* Letter of August 10, 2021, attached as Exhibit "2" hereto.

10.    The events giving rise to the resolution and the foundation for declaring the Mutual Release and Settlement Agreement to be valid and binding, are as follows.

11.   On or about April 18, 2019, the Parties entered into a purchase and sale contract for the delivery of fuel to the Vessel *Gentle Seas*. *See* Sales Confirmation is attached hereto as Exhibit "A".

12.   This Purchase and Sale Contract incorporated "The World Fuel Services Marine Group of Companies General Terms and Conditions dated May 1, 2016." *See* General Terms and Conditions dated May 1, 2016 is attached hereto as Exhibit "B".

13.   On May 14, 2019, when the quantity of fuel was confirmed under the contract, an updated Confirmation was sent, which also incorporated the same Terms and Conditions set forth in Exhibit "B". *See* updated Confirmation is attached hereto as Exhibit "C".

14.   The purchase order memorialized in the Confirmations was made by Charterer for itself and Defendant Alcyone as per the Seller's Terms and Conditions of the contract. *See* Exhibit "B."

15.   On May 14, 15, 16, and 17, 2019, the owner's representative and authorized agent, Inchcape Shipping Services, continually wrote to Seller repeatedly acknowledging notice and authorization for the fuel purchased, without any objection to the terms and conditions binding the Owner and repeatedly insisting the fuel purchased be supplied promptly in writing on every day noted above "(a)s the vessel is on a very tight schedule, please program for your bunker barge to supply promptly…We/Owner will not accept any delay in the supply."

16.   Defendant Alcyone allowed the Charterer to purchase fuel and bind the Defendant Alcyone when it manifested actions to make the Charterer appear as if it

was acting as its agent by (1) turning over its Vessel *Gentle Seas* to Charterer to operate and manage; (2) by authorizing Charterer to purchase fuel on behalf of itself and Vessel *Gentle Seas*, (3) by repeatedly acknowledging on the four days leading up to the delivery notice of the fuel purchase, implied authority of the fuel purchase and opportunity to object to binding the owner without doing so; and (4) after having full knowledge of the purchase contract and order binding the Defendant Alcyone pursuant to the terms of the contract, then subsequently authorizing its Master and crew to accept the bunkers provided and supplied by the Plaintiff without protest or objection to the terms the Defendant Alcyone knew and/or should have known bind it to the contract for the fuel at issue in this lawsuit.

17.   Pursuant to the May 14, 2019 final Confirmation and confirmed by a Bunker Delivery Note (receipt for the fuel supplied), the Vessel was provided, on May 18, 2019, at the port of Singapore with 598.9660 metric tons of fuel 380 CST / RMG 380 Max 3.5%S(10) at USD 428.00 per metric ton. True and correct copies of the final Confirmation and Bunker Delivery Note are attached, respectively, hereto as Exhibits "B" and "D".

18.   An invoice bearing number 309549-31501 was issued on May 27, 2019 by WFS Singapore for the contractual debtors; the Vessel, the Defendant Owner, the Defendant Charterer, and the Vessel operator(s), for an amount of USD 256,357.45. A true and correct copy of the Invoice is attached hereto as Exhibit "E".

19.   The invoice was due July 2, 2019 and remained unpaid, constituting a material breach of the Parties' agreement.

20.   Plaintiff World Fuel Services suffered damages as a result of this material breach. Specifically, as of August 6, 2020, for this delivery, Defendants Alcyone owed $319,870.89, made up of $256,357.45 in principal, $50,695.56 in interest, and $12,817.87 in contractual fees. A true and correct copy of the Statement of Account for WORLD FUEL SERVICES (SINGAPORE) PTE LTD as of August 6, 2020 is attached hereto as Exhibit "F".

21.   World Fuel Services filed an action for a conservatory arrest of the Vessel *Gentle Seas* in the port of Owendo (Gabon) which was granted by the President of the Tribunal de Commerce de Libreville on 10 July 2020, a procedural measure alleging maritime claim(s) whereby the Vessel *Gentle Seas* was arrested.

22.   Defendant Alcyone posted no security, despite being afforded the opportunity to do so. Thus, the Vessel *Gentle Seas* remained under arrest in accordance with Gabonese law on conservatory arrests.

23.   Defendant Alcyone was afforded the opportunity to and did challenge the arrest of its vessel. The first challenge was raised on July 21, 2020. There was an initial hearing on that challenge that took place on July 29, 2020.  And a further hearing was had on August 12, 2020, with a third hearing scheduled for August 24, 2020.

24.   The second challenge was made on August 13, 2020. Responses thereto were made on August 14 and 18, 2020. And on August 20, 2020, the President of the Tribunal de Commerce of Libreville rendered judgement. The arrest was not lifted.

25.   Thereafter, just a few days before a hearing on the still pending first challenge was scheduled, a reasonable settlement was achieved.

26.   In reliance on this agreement, World Fuel Services not only released its claims against Defendant Alcyone, it also released the Vessel *Gentle Seas* from the valid arrest, and it dismissed the lawsuit it previously filed in this Court. *See* World Fuel Services (Singapore) Pte Ltd. vs. 24Vision Chartering Solutions, DMCC, Alcyone International Marine, Inc., USDC, SD Fla. 20-23288-CIV-WILLIAMS. Defendant Alcyone also discontinued its pending application with the court in Gabon with the court granting the discontinuance on or around September 1, 2020.

27.   World Fuel Services (Singapore) Pte Ltd. has been compelled to retain counsel to respond to the demand presented.  The terms of the Mutual Release and Settlement Agreement shift the burden of reasonable attorney's fees and costs to the prevailing party. *See* Ex. 1, Mutual Release and Settlement Agreement at paragraph 11.

WHEREFORE, Plaintiff World Fuel Services (Singapore) Pte Ltd respectfully requests the Court to enter Final Judgment declaring the Mutual Release and Settlement Agreement to be valid and binding; precluding Defendant Alcyone International Marine, Inc. from challenging the validity of the Mutual Release and Settlement Agreement; awarding reasonable attorneys fees and costs; and for such other and further relief the court deems just and proper.

Respectfully submitted,

/s/   *David N. Gambach*

David N. Gambach, Esq.
Florida Bar No. 8540
HAMILTON, MILLER & BIRTHISEL, LLP.
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone 305-379-3686
Facsimile 305-379-3690
DGambach@HamiltonMillerLaw.com
EGutwein@HamiltonMillerLaw.com
JFlorin@HamiltonMillerLaw.com
JMendez@HamiltonMillerLaw.com
*Attorneys for PETITIONERS.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 23, 2021, I electronically filed the forgoing document with the Clerk of the Court using CM/ECF.

/s/    *David N. Gambach*
David N. Gambach, Esq.

**EXHIBIT 1**

**EXHIBIT 2**

# Gurbani & Co LLC

Advocates & Solicitors | Commissioners for Oath | Notaries Public
*in association with* Acies Law

78 Shenton Way
#31-02
Singapore 079120

T : +65 6336 7727
M : +65
F : +65 6336 0110
W : *www.gurbaniandco.com*
E : ganesh@gurbaniandco.com

We do not accept service of
court documents by fax or email.

Our ref:  BRG/20200202
Your ref:

Total no. of pages: 4.

10 August 2021

**World Fuel Services (Singapore) Pte Ltd**
238A Thomson Road
08-01/10 Novena Square Tower A
Singapore 307684

Dear Sirs,                                                                                    **BY POST & EMAIL**

**RE:  MV "GENTLE SEAS" (IMO No. 9703514)**
**Conservatory Order / Arrest in Gabon pursuant to Acte No. 334/2019-2020;**
**Dossier No. 112 du 10 July 2020**

1.      We act for M/s Alcyone International Marine Inc ("**Alcyone**").  As you know, Alcyone
are the registered owners of MV "GENTLE SEAS" (the "**Vessel**").

2.      We are instructed that the Vessel was arrested at Gabon pursuant to a conservatory
Order obtained by you in respect of bunkers alleged stemmed by you or by your agents
and / or sub-contractors pursuant to your instructions on or about 18 May 2019 (the
"**Bunkers**").

3.      We are instructed that:

   a.      the Vessel was chartered to M/s 24Vision Chartering Solutions DMCC (the
          "**Charterers**") pursuant to a time-charterparty pursuant to which the Charterers
          were to "*provide and pay for all the fuel*" necessary to operate the Vessel;

   b.      on or about 10 May 2019, by way of an email of the same date between Varun
          Ganesan of the Charterers you, you agreed to provide the Charterers between
          "*600.00 to 800.00 MTONS*" of "*380CST*" fuel oil – i.e. the Bunkers between 11 to
          21 May 2019 at the port of Singapore;

   c.      on or about 15 May 2019, Capt. Fotis Dracopoulos of Allseas Marine SA, as
          Alcyone's agents, specifically brought to your attention that your agreement to
          supply Bunkers was with the Charterers and not Alycone and as such Bunkers
          were being furnished solely upon the credit of the Charterers, Alcyone would not
          therefore be liable for payment under your agreement or otherwise in respect of
          the Bunkers. Specifically, Capt. Dracopoulos stated:

Gurbani & Co LLC (UEN 201506400W) is a law corporation incorporated in Singapore with limited liability.

This letter and any attachments enclosed with it are confidential and intended solely for the use of the individual or entity to
whom they are addressed.  If you have received this letter in error, please notify us immediately.



"*We, ALLSEAS MARINE SA, as Managers on behalf of the Owners of the subject vessel, would like to bring to you kind attention that the M/V GENTLE SEAS, Liberia flag and IMO 9703514 has been chartered to Messrs. 24VISION CHARTERING SOLUTIONS DMCC.*

*It has come to our attention that in your capacity of physical supplier at Singapore, where our said vessel trades, you may be called by the said charterers to furnish bunker grade:*
    *FUEL GRADE/SPEC : 380CST/ISO 8217:2010:RMG380 MAX*
        *3.5%S*
    *QUANTITY :    600.00 MTONS*
*for their use in connection with the vessel.*

*We wish you to advise for your guidance that under the terms of the charter party between the Owners of the said vessel and the said Charterers, neither the Charterers nor the Master nor any other person has power or authority to pledge either our or said vessel's credit, or to create, or permit to be created, any liens on our vessel, and that accordingly any such bunkers furnished by you to our said vessel will be so furnished solely upon the credit of Messrs. 24VISION CHARTERING SOLUTIONS DMCC. and not on the credit of the vessel or her Owners and/or ourselves as her Managers.*"

d.    on or about 18 May 2019, pursuant to your instructions or other agreement, MT "FRIENDSHIP" stemmed 598.966 Metric Tonnes of "*MFO 380 CST*" – i.e. the Bunkers to the Vessel.  Prior to stemming such Bunkers, Master of the Vessel Capt. Staichu Mihai-Codrut issued the following "*Notice to Supplier (Bunkers / Port Services / Agency etc.)*" dated 18 May 2019 to MT "FRIENDSHIP":

"*My vessel is under time charter to Messrs **24 VISION CHARTERING SOLUTION DMCC**.  It is a condition of the charter that all supplies of goods and materials ordered by the Charterers, their sub-Charterer or their agents shall be paid for only by them.  Accordingly, please be advised that neither the Owners not the vessel shall be responsible for any supply that you are to deliver / supply to my ship and you should look only to the party ordering same for payment.*

*Please confirm you accept this pre-condition to the supply of **600 MT OF 380CST RMG MAX 3.5% SULPHURS** to my vessel at Singapore Anchorage.*"



Accordingly, MT "FRIENDSHIP" stemmed Bunkers subject to the pre-condition that the same were to be supplied against the Charterer's credit only.

4.   Notwithstanding the express notice that your agreement to supply Bunkers to the Vessel was with the Charterers only and that the supply of such Bunkers was against the credit of the Charterers only, we are instructed that you wrongfully obtained a Conservatory Order against the Vessel on 10 July 2020.  In this regard, we are instructed that you failed to bring to the Court's attention that the Vessel was under a time-charterparty and / or was not chartered by demise and that your alleged claim for the cost of supplying Bunkers to the Vessel arose out of an agreement with the Charterers and not against Alcyone and / or the Vessel.

5.   In view of:
   a.   the prevailing judicial recess which rendered the resort to further or alternative legal remedies impracticable and / or futile;
   b.   your persistent, wrongful refusal to accept reasonable security offered by Alycone's IG P&I Club (without prejudice to the Alcyone's defences) and / or negotiate the terms of the same;
   c.   persistent, wrongful demands for Alcyone to admit liability to your alleged claims against the Charterers; and
   d.   the continuing, wrongful restraint on Alcyone trading the Vessel;
   we are instructed that Alcyone on 12 August 2020 consented to settle your alleged claims with a view to minimising their mounting financial distress and loss of use of the Vessel in the absence of any reasonable, alternative course of action.  In the premises, the Mutual Release and Settlement Agreement dated 20 August 2020, and the sum of USD180,000.00 extracted from Alcyone thereunder, was procured under duress and / or illegitimate pressure.  We are therefore instructed that you have been unjustly enriched at Alcyone's expense in the amount of USD180,000.00.

6.   **We hereby demand the refund of the sum of USD180,000.00, plus interest at the rate of 5.33%** per annum from 20 August 2020 **by <u>24 August 2021,</u>** failing which we have been instructed to commence proceedings against you.  In such event, Alcyone will additionally claim costs against you.  By means of those proceedings Alcyone will exercise its right of election to set aside the Mutual Release and Settlement Agreement dated 20 August 2020.

7.   Please note that nothing herein shall amount to an agreement with or admission of any allegation or claim made by you.  All of Alcyone's rights to challenge any and all of your allegations and to dispute the authenticity and veracity of any documents supplied by you are expressly reserved.  Further, Alcyone's rights to rely on any further facts



and / or circumstances in addition to those set out above and to add to and / or supplement their demands set out above with new and/or additional claims, including for damages for wrongful arrest at the full value of their loss of use of the Vessel, are expressly reserved.

Yours faithfully,

**Gurbani & Co LLC**

**EXHIBIT A**

Thursday, August 6, 2020 at 11:45:16 Eastern Daylight Time

**Subject:** FW: {CONFIRMATION: GENTLE SEAS / SINGAPORE / 3085148}
**Date:** Thursday, August 6, 2020 at 11:44:46 AM Eastern Daylight Time
**From:** Scott Wagner
**Attachments:** image001.jpg, image002.gif

    **From:** <NBrage@wfscorp.com>
    **Date:** 18 April 2019 at 7:48:01 PM SGT
    **To:** <REGINALDROBYN@24VISION.SOLUTIONS>, <VARUNGANESAN@24VISION.SOLUTIONS>
    **Cc:** <mtamsitt@wfscorp.com>
    **Subject:** {CONFIRMATION: GENTLE SEAS / SINGAPORE / 3085148}



```
18-APR-2019 11:47 GMT


++ Please advise final quantity ++


TO                  : 24VISION CHARTERING SOLUTIONS DMCC
ATTENTION           : REGINALD ROBYN
                    : VARUN GANESAN
FROM                : WORLD FUEL SERVICES

WORLD FUEL SERVICES CONFIRMS you have placed following firm order:

VESSEL              : GENTLE SEAS

IMO or WFS Reference Number 9703514 (Included for reference purposes only)

PORT                : SINGAPORE
DATE                : 11-MAY-2019 TO 21-MAY-2019

SELLER              : WORLD FUEL SERVICES
                      A TRADE NAME/DIVISION OF WORLD FUEL SERVICES (SINGAPORE) PTE L
PAYMENT TERMS       : 45 DDD BY TT
BUYER               : MV GENTLE SEAS AND HER OWNERS/OPERATORS AND
                      24VISION CHARTERING SOLUTIONS DMCC

PHYSICAL            : KAIROS, ENGHUA
FUEL GRADE/SPEC     : 380CST/ISO 8217:2010:RMG380 MAX 3.5%S
QUANTITY            : 600.00 TO 800.00 MTONS
```

```
PRICE              : USD 428.00 / MTONS  DELIVERED
```

* In the event of Buyer cancelling order, or under-lifting of quantity, for
  any reason, Buyer shall be responsible for standard cancellation fee,
  plus any difference between the contract price of any unlifted quantities
  and the amount received by Seller upon resale.

* MGO:  Please note that any MGO ordered at Singapore will meet DMA specs
  except for pour-point, which is typically 3-6 degrees C.

* GST [Singapore Goods & Services Tax]:
  It is the Buyer's responsibility to provide documentation via agent to
    prove that vessel is on an international voyage. If such documentation
    is not provided prior to bunkering, GST will be charged on entire
    sales amount.
  It is the Buyer's responsibility to ensure that the BDN/Bunker Delivery
    Receipt is endorsed with vessel's stamp and signature of Master or Chief
    Engineer, to qualify for a zero-rated purchase in compliance with the
    Singapore Goods & Services Tax requirements. Failing this, GST will be
    charged on the entire sales amount.

*Delivery to be in accordance with Singapore Technical Reference 48 (TR 48) with


* Overtime/demurrage/cancellation fees/other charges (if any) at cost for Buyer's

* Please ensure close coordination between agent/local supplier at all times

* Please inform us by return of any errors, omissions or changes in the above


All sales are on the credit of the vessel. Buyer is presumed to have authority
to bind the vessel with a maritime lien. Disclaimer stamps placed by the vessel
on the delivery receipt will have no effect and do not waive the Seller's lien.


This confirmation is governed by and incorporates by reference the Seller's Marin
Group of Companies General Terms and Conditions for the sale of marine fuel
products and related services, including the law and jurisdiction clause therein,
in effect as of the date that this confirmation is issued, unless alternative
terms and conditions have been prior agreed in writing by an authorised
representative of the Seller. The Seller's Marine Group of Companies General
Terms and Conditions can be found at:
https://www.wfscorp.com/Marine/pdf/Marine-Terms.pdf


Notwithstanding any other terms and conditions that may have been agreed in
writing between the parties, each party represents and warrants to the other

that at all times during the term of this Agreement it will comply with all laws and shall obtain all appropriate government approvals applicable to the performance of its obligations under this Agreement.

Notwithstanding the generality of the foregoing:

(a) Each party represents and warrants to the other that at all times during the term of this Agreement:

(1) it is knowledgeable about Anti-Bribery Laws applicable to the performance of obligations under this Agreement and will comply with all such Anti-Bribery Laws;

(2) neither it nor, to its knowledge, any director, officer, agent, employee or o person acting on its behalf, has made, offered or authorized, or will make, offer authorize, either directly or indirectly, any unlawful payment, gift, promise or advantage related to this Agreement; and

(3) it has instituted and maintains policies and procedures designed to ensure co compliance with Anti-Bribery Laws applicable to its performance under this Agreem including, but not limited to, the maintenance of accurate books and records. Reg of whether they may be directly applicable to a party, as a minimum, "Anti-Briber means the United States Foreign Corrupt Practices Act of 1977 and the United King Bribery Act 2010 (each as amended from time to time) and all other applicable nat regional, provincial, state, municipal or local laws and regulations that prohibi bribery of, or the providing of unlawful gratuities or other benefits to, any gov official or any other person.

(b) Each party represents and warrants to the other that at all times during the of this Agreement:

(1) it is knowledgeable about Trade Laws applicable to each party to this Agreeme will perform this Agreement such that each party remains in full compliance with applicable Trade Laws (currently Iran, Cuba, Syria, North Korea and the Crimea Region of Ukraine);

(2) except as authorized or otherwise not prohibited under the terms of any appli Trade Laws, neither it, nor any of its subsidiaries or, to its knowledge, any dir officer, employee, agent, or affiliate, is an individual or entity ("Person") tha is or is owned or controlled by Persons that are (i) the subject of Trade Laws, o (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Trade Laws;

(3) it obtains and maintains all certifications, credentials, authorizations, licenses and permits necessary to perform under this Agreement in compliance with all applicable Trade Laws; and

(4) it has instituted and maintains policies and procedures designed to ensure continued compliance with all Trade Laws applicable to the performance of this Agreement, including, but not limited to, the maintenance of accurate books and records. Regardless of whether they may be directly applicable to

a party, as a minimum, "Trade Laws" includes all sanctions, embargoes, or other trade restrictions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC", including the OFAC Specially Designated Nationals List ("SDN List")), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or any other applicable authority or regulatory body (which currently includes Iran, Cuba, Syria, North Korea and the Crimea Region of Ukraine.)

(c) Each party represents and warrants to the other that at all times during the term of this Agreement:

(1) it is knowledgeable about Labor Laws applicable to the performance of all obligations under this Agreement and will comply with all such Labor Laws;

(2) it has instituted and maintains policies and procedures designed to ensure continued compliance with Labor Laws applicable to its performance under this Agreement, including, but not limited to, the maintenance of accurate books and records. Regardless of whether they may be directly applicable to a party, as a minimum, "Labor Laws" means the UK Modern Slavery Act 2015 and the United Nations Universal Declaration of Human Rights and all other applicable national, regional, provincial, state, municipal or local laws and regulations that (i) prohibit the use of forced or child labor, discrimination, harassment, abuse, or retaliation in their work place, and (ii) require providing wages, benefits, and working hours that meet or exceed the applicable legal standards and regulations.

(d) Notwithstanding any other clause of this Agreement, either party may terminate this Agreement immediately upon written notice to the other party at any time if, in its reasonable judgment, the other party is in breach of any of the representations and warranties in sub-clauses (a), (b), or (c) of this clause.

For changes please contact: Sinding Brage-Andersen, Nanna at NBrage@wfscorp.com

Authorized signatory for the World Fuel Services entity stated above,

BEST REGARDS
MARK TAMSITT

MSG#: 3085148





**EXHIBIT B**

# The World Fuel Services Marine Group of Companies General Terms and Conditions



Effective May 1, 2016, the following terms of sale and supply shall constitute the General Terms and Conditions ("General Terms") of the World Fuel Services Marine Group of companies (collectively, "World Fuel Services"), 9800 N.W. 41st Street, Suite 400, Miami, Florida 33178, which includes, but is not limited to, World Fuel Services, Inc.; World Fuel Services Europe, Ltd.; World Fuel Services (Singapore) Pte. Ltd.; World Fuel Services Canada, ULC, World Fuel Services (Denmark) ApS; Tramp Oil Germany GmbH; Tramp Oil (Brasil) Ltda.; Tramp Oil and Marine (Chile) Limitada.; Henty Oil Limited; Falmouth Petroleum Limited; Trans-Tec International S.R.L.; Casa Petro S.R.L.; World Fuel Services Trading, DMCC; World Fuel Services (Australia) Pty Ltd; World Fuel Services Mexico, S. de R.L. C.V. and their respective trade names, subsidiaries, affiliates and branch offices. Unless otherwise agreed in writing, the General Terms shall apply to every sale of marine petroleum products ("Products") entered into between any World Fuel Services entity as seller ("Seller") and any buyer ("Buyer") of such Products.

1. **INCORPORATION AND MERGER:** Each sale of Products shall be confirmed by e-mail, fax or other writing from Seller to Buyer ("Confirmation"). The Confirmation shall incorporate the General Terms by reference so that the General Terms thereby supplement and are made part of the particular terms set forth in the Confirmation. The Confirmation and the General Terms shall together constitute the complete and exclusive agreement governing the transaction in question (the "Transaction"). No other prior agreements or understandings, whether verbal or written, shall apply unless specifically referenced in the Confirmation. In the event of an inconsistency or conflict between the particular terms of the Confirmation and the General Terms, the Confirmation shall control for the purpose of that particular Transaction with the exception of Clauses 8 and 18 below, which can only be modified by a mutually signed writing between Buyer and Seller.

2. **PRICES:** The price to be paid for Products sold in each Transaction shall be as agreed between Buyer and Seller in the Confirmation. Unless otherwise specified, the quoted price shall be ex-wharf and shall represent only the purchase price of the Products. If the price is quoted as "delivered," then, in addition to the purchase price of the Products, the price shall include the cost of transportation. Buyer shall pay any additional expenses or costs such as barging, demurrage, wharfage, port dues, duties, taxes, fees and any other costs, including, without limitation, those imposed by governmental authorities. Seller reserves the right, upon notification to Buyer, to adjust the price after the date of the Confirmation to reflect any unanticipated increase in costs to Seller incurred after issuance of the Confirmation. If Buyer does not accept such adjustment, the delivery of the affected quantity of the Products shall be cancelled without liability to either party.

3. **QUALITY:** Unless otherwise specified in the Confirmation, the Products shall be of the quality generally offered by Seller at the time and place of delivery, for the particular grade or grades ordered by Buyer. Should the Confirmation refer to a particular specification, the analysis of any test results shall make allowances for generally recognized industry standards of repeatability and reproducibility. All grades of Products may contain bio-derived components generally acceptable in the petroleum industry. Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Confirmation. Conversely, where minimum values are

The World Fuel Services
Marine Group of Companies
General Terms and Conditions



**3.** **QUALITY (continued):** provided in a specification, no maximum values are guaranteed unless expressly stated in the Confirmation. Buyer shall have the sole responsibility for the selection of proper Products for use in the vessel being supplied ("Receiving Vessel") or other receiving facility. The product is, according to industry norm, the quality AT DELIVERY and prior to appropriate treatment by Receiving Vessel for use. **ANY OTHER CONDITIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, USE AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.**

**4.** **QUANTITY:** The quantity of Products sold in each Transaction shall be as agreed between Buyer and Seller in a Confirmation. Notwithstanding acceptance of Buyer's order, Seller's obligation to supply such quantities shall be subject to availability of Products from Seller's source of supply at the time and place delivery is requested. Actual quantity delivered may vary in accordance with normal operational tolerances of delivery equipment.

**5.** **TITLE AND RISK OF LOSS:** Delivery of the Products shall be completed and title to and risk of loss of the Products shall pass to Buyer from Seller when the Products pass the flange connection at the end of the physical supplier delivery hose or pipe connected to the Receiving Vessel or its receiving facilities, including the barge or coastal tanker nominated by Buyer. Buyer shall be responsible for such flange connection, and pumping shall be performed under the direction and responsibility of Buyer.

**6.** **MEASUREMENT, TESTING AND CLAIMS:**

**(a)** The quantity of the Products delivered shall be conclusively determined from the official gauge or meter of the bunkering barge or tank truck effecting delivery. However, in those ports where legal or operational requirements or industry practice dictate that quantities are measured by referencing either shore tank figures or barge loading figures, such measurements shall instead be conclusive. In cases of delivery ex-wharf, shore tank figures shall be conclusive. Quantities calculated from the Receiving Vessel's soundings shall not be considered. Quantity claims are waived by Buyer unless expressly noted in writing on the Bunker Delivery Receipt ("BDR") at the time of delivery or, in ports where such notation on the BDR is not permitted, presented at the time of delivery to the physical supplier's personnel in a separate letter of protest.

With respect to the quality of the Products supplied, samples shall be drawn at the time of delivery. The method of sampling will be governed by local regulation, if such exists, otherwise as per the method used by the local physical supplier. Buyer or its representatives may witness the sampling but the absence of Buyer or its representatives at the time of sampling shall not prejudice the validity of the samples taken.

**(b)** These samples shall conclusively represent the quality of the Products supplied to the Receiving Vessel. In the event of a claim by Buyer, the sample(s) in Seller's

The World Fuel Services
Marine Group of Companies
General Terms and Conditions



**(b)** or its physical supplier's possession shall be tested and analyzed by an independent surveyor, located in the country (and where available, port) of supply, whose results shall be conclusive and binding on both Buyer and Seller, absent fraud or manifest error. The independent surveyor shall be appointed by mutual agreement, and the surveyor's fee shall be shared equally by Buyer and Seller (provided, however, if such surveyor analysis does not show any deviations from agreed-upon quality, the surveyor's fee shall be for Buyer's account). In the event that Seller proposes an independent inspector and Buyer takes no action to either accept this proposal or to suggest an alternative inspector, then Seller's choice of inspector shall be binding and any tests performed by such inspector's lab shall be similarly binding, regardless of whether or not Buyer chooses to send a representative to such testing.

**(c)** Any samples drawn by Buyer's personnel either at the time of bunkering or at any date after bunkering shall not be valid as an indicator of the quality of the Products supplied. The fact that such samples may bear the signature of personnel aboard the delivery conveyance shall have no legal significance as these local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for any claims arising in circumstances where Buyer has commingled the Products on board the vessel with other fuels or additives.

**(d)** Buyer waives any claim against Seller for any reason, including but not limited to the quantity or quality of the Products supplied, unless Buyer's claim is submitted to Seller in writing within seven (7) calendar days after the date of delivery of the Products. However, in the event that the physical supplier grants to Seller a period longer than seven (7) days in the physical supplier's own terms and conditions, then this same period will be extended from Seller to Buyer. In any event, should any timely claim submitted by Buyer not be settled to Buyer's satisfaction in a commercial manner, any legal action by Buyer thereon shall be formally waived and time barred unless commenced under Clause 18 (Law and Jurisdiction) within six (6) calendar months after the delivery date or, in claims related to non-delivery, within six (6) calendar months after the scheduled delivery date.

**(e)** If Buyer submits a claim against Seller with respect to the quantity or quality of the Products supplied, Seller shall be entitled and Buyer shall allow, or where Buyer has chartered the Receiving Vessel, shall obtain authorization from the owner of such vessel to allow, Seller to board the Receiving Vessel and investigate the vessel's records and to make copies of documents which Seller may consider necessary for its investigations. Failure to allow boarding and/or to produce copies of documents shall constitute a waiver of Buyer's claim.

**(f)** It is the duty of Buyer to take all reasonable actions to eliminate or minimize any damages or costs associated with any off-specification or suspected off- specification Products. To this end, Buyer shall cooperate with Seller in achieving the most cost effective solution, including the consumption of the Product after



The World Fuel Services
Marine Group of Companies
General Terms and Conditions

**(f)**   treatment, blending and/or special handling. In the event that the Product is off-specification and cannot be consumed by the Receiving Vessel, Buyer's remedies shall be limited exclusively and solely to the replacement of the nonconforming Product. If Buyer removes the Product without the express written consent of Seller, then all such removal and related costs shall be solely for Buyer's account. **IN ANY EVENT, SELLER'S LIABILITY FOR ANY CLAIMS, WHETHER ARISING FROM QUALITY, QUANTITY, ACCIDENT, DELAY, SPILL OR ANY OTHER CAUSE, SHALL NOT EXCEED THE PRICE OF THAT PORTION OF THE PRODUCT SOLD ON WHICH LIABILITY IS ASSERTED. FURTHERMORE, NO LIABILITY WILL BE BORNE BY SELLER FOR (1) ANY DEMURRAGE OR OTHER VESSEL DELAY OR FOR INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES ARISING FROM THE EXERCISE OF SELLER'S RIGHT TO SUSPEND AND/OR TERMINATE DELIVERY OF PRODUCT.**

7.   **PAYMENT:**

**(a)**   Unless otherwise provided in the Confirmation, all sales shall be on a cash in advance, irrevocable letter of credit basis, or other form of credit support acceptable to Seller. All letters of credit procured by Buyer in favor of Seller shall be in a form and substance acceptable to Seller and issued only by a bank acceptable to Seller.

**(b)**   Any individual bunker transaction not requiring payment of cash in advance shall require credit approval by Seller's Credit Department in Miami, Florida. This approval, which will occur prior to Seller's transmittal to Buyer of a Confirmation, shall be construed as the binding act in a bunker transaction and it is agreed that contract formation has occurred in Florida. If payment of cash in advance is not required, Buyer shall make payment in full on or before the due date set forth in the invoice, in immediately available U.S. dollars and in such manner as Seller may designate in the invoice, without discount, set-off, counterclaim or deduction. Invoices may be sent via fax, e-mail or any other means permitted by law. In the event that delivery documents are not available, Seller may invoice based on email or facsimile advice of delivery details in lieu of delivery documents. Notwithstanding any disputes regarding quality, quantity or other matter, Buyer must initially pay the full amount due, and any disputes shall be resolved between Buyer and Seller after such payment has been made. Failure by Buyer to pay the full amount when due shall constitute a waiver of any claims by Buyer.

**(c)**   Past due amounts shall accrue interest at a rate equal to the lesser of 2% per month, or the maximum rate permitted by applicable law. All amounts more than fifteen (15) days past due shall incur an additional 5% administrative fee. All payments received from Buyer after an invoice is overdue shall first be applied to interest, legal collection costs and administrative fees incurred before they will be applied to the principal amounts on a subsequent delivery. Buyer may not designate application of funds to a newer invoice so long as there are any unpaid



## The World Fuel Services
## Marine Group of Companies
## General Terms and Conditions

**(c)** charges, interest, collection costs or administrative fees on a previous one. This shall not be construed, however, as preventing Seller's option to choose application of funds in instances where sub-clause (h) below shall apply. Any waiver by Seller of interest charges or administrative fees on a particular invoice shall not be construed as a waiver by Seller of its right to impose such charges on subsequent deliveries.

**(d)** If the payment due date falls on a weekend or any bank holiday in the country where payment is to be remitted (other than a Monday), payment must be made on the first prior available banking day. If the payment due date falls on a Monday bank holiday, payment may be made on the next available banking day.

**(e)** Buyer and Seller are responsible for each of their respective banking charges.

**(f)** Buyer agrees to pay, in addition to other charges contained herein, internal and external attorneys fees on a full indemnity basis for Seller's collection of any non- payment or underpayment, as well as any other charges incurred by or on behalf of Seller in such collection, including, but not limited to, the cost of bonds, fees, internal and external attorneys fees associated with enforcing a maritime lien, attachment or other available right, whether in law, equity or otherwise.

**(g)** All unpaid invoices from Seller to Buyer shall immediately be considered overdue, upon the occurrence of any of the following events: (i) any invoice of Seller to Buyer is seven (7) days overdue; (ii) any vessel owned or operated by Buyer is arrested or attached by Seller or a third party for unpaid debts; or (iii) there is a change in the financial circumstances or structural organization of Buyer sufficient to cause Seller to reasonably believe that its likelihood of receiving payment from the Buyer is jeopardized or that its security interest in any of Buyer's owned, managed, chartered, operated or otherwise controlled vessels is jeopardized.

**(h)** In the event that more than one invoice is past due, Seller shall be entitled, at its sole discretion, to specify the particular invoice to which any subsequent payments shall be applied.

**(i)** Seller reserves the right, in addition to all other rights and remedies available to it under applicable law, in equity, or otherwise, to suspend further deliveries of Product, and demand payment of all outstanding balances, if the outstanding balances due from Buyer (including estimates of unbilled sales) exceed Buyer's applicable credit limit, or if Buyer fails to make any payment as herein provided or otherwise defaults under the General Terms.

The World Fuel Services
Marine Group of Companies
General Terms and Conditions



**8.** **CREDIT AND SECURITY; ADEQUATE ASSURANCE:**

**(a)** Products supplied in each Transaction are sold and effected on the credit of the Receiving Vessel, as well as on the promise of Buyer to pay, and it is agreed and Buyer warrants that Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered. This maritime lien shall extend to the vessel's freight payments for that particular voyage during which the Products were supplied and to freights on all subsequent voyages. Disclaimer of lien stamps placed on a Bunker Delivery Receipt shall have no effect towards the waiver of such lien.

**(b)** If Buyer fails to pay Seller any amounts owed when due, or if Seller, in its sole discretion at any time and for any reason, deems the credit or financial condition of Buyer to be impaired, unsatisfactory or unacceptable or otherwise has reasonable grounds for insecurity with respect to Buyer's performance hereunder, Seller, at its sole option, may require Buyer to pay cash (in an amount reasonably determined by Seller in its commercially reasonable judgment) to reflect the value of any future deliveries of product or may require Buyer to post an irrevocable standby letter of credit or other security reasonably required by Seller, and may suspend all further deliveries of product until such security is received. If such requested security is not received within the time specified by Seller, then such failure shall be an event of default hereunder with respect to Buyer, allowing Seller to terminate or suspend its obligations with respect to the applicable Transaction(s) or any other agreement between Buyer and Seller, as well as impose cancellation fees set forth in Clause 10 below, or exercise any other remedies allowed by applicable law, equity or otherwise.

**(c)** If the purchase of Products is contracted for by Buyer's agent, then such agent, as well as Buyer as principal, shall each be bound by and be fully liable for obligations of Buyer in the Transaction.

**(d)** All sales made under these terms and conditions are made to the registered owner of the Receiving Vessel, in addition to any other parties that may be listed as Buyer in the confirmation. Any Products ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner of the Receiving Vessel and such registered owner is fully liable as a principal for payment of the bunker invoice.



The World Fuel Services
Marine Group of Companies
General Terms and Conditions

**9.** **DELIVERIES**

**(a)** Buyer shall give Seller's local representative at the port of supply at least 48 hours prior written notice of the scheduled time of delivery, excluding Sundays and holidays.

**(b)** In the event that delivery is desired outside normal working hours and is permitted by port regulations, Buyer shall pay any overtime and additional expenses incurred in connection therewith.

**(c)** Buyer shall provide, free of charge, a clear safe berth, position or anchorage alongside the Receiving Vessel's receiving lines. Seller shall be under no obligation to make deliveries when, in Seller's sole opinion, a clear and safe berth, position or anchorage is not available. Buyer shall make all connections and disconnections of the delivery hose to the Receiving Vessel or barge or coastal tanker nominated on behalf of Buyer and shall render all other necessary assistance and equipment to promptly receive the Products.

**(d)** Seller shall use due diligence in the timely delivery of Product to Buyer's Receiving Vessel. However, Seller shall not be liable for any delays due to congestion at the loading terminal, prior commitments of available barges/trucks, or discretionary decisions of the local transportation provider as to the vessel's order of placement.
In the case of actual delays not caused by the above circumstances, and which can be attributed solely to the gross negligence of Seller, Seller will reimburse Buyer for reasonable port costs such as shifting, pilotage and berthing. However, under no circumstances will Seller be liable for costs of ship's demurrage, off- charter hire or for indirect, special, incidental, exemplary, punitive or other consequential damages. If the actual delivery date is later than the contracted date stated in the Confirmation, the price may be subject to fluctuations up to the time of actual delivery, at Seller's discretion. If the Receiving Vessel does not arrive within five (5) days after the expected date of arrival, Seller shall have the right, at its sole discretion, to cancel the Transaction without prejudice to any other rights Seller may have.

**(e)** Seller shall be at liberty to make arrangements with other companies ("Suppliers") to supply the whole or any part of the Products sold in each Transaction.

**(f)** Buyer shall be responsible for all demurrage or additional expenses incurred by Seller if Buyer, its vessel or its port agent causes delay to the barge, truck or delivery facilities. Buyer shall also pay any charges for mooring, unmooring and port dues, if incurred. In addition, Buyer shall be liable for any expenses incurred by Seller resulting from Buyer's failure to accept the full quantity of Products ordered by Buyer.

**10.** **CANCELLATION:** Buyer agrees and acknowledges that in order for Seller to offer the product to Buyer over the applicable delivery period, Seller has entered into or may enter



## The World Fuel Services
## Marine Group of Companies
## General Terms and Conditions

**10.** **CANCELLATION (continued):** into one or more transactions with third parties, including derivative and/or hedging transactions using financially settled instruments with third parties or physical products purchase and sale transactions with Seller's physical supplier. In the event that Buyer does not purchase the entire quantity of product from Seller as contracted, Seller may suffer losses as a result of exposure under the foregoing transactions. As such, Buyer agrees to purchase and accept delivery of the full quantities contracted, and to do so within the designated delivery period. In the event that Buyer purchases less than the full contracted quantity for any reason, or purchases such quantities outside the designated delivery period(s), regardless of fault or causation and without regard to Force Majeure, then, without prejudice to Seller's other rights and remedies it may have against Buyer, Buyer shall be liable to Seller for all damages incurred, including those incurred by Seller as a result of having entered into the foregoing transactions or having to enter into any replacement transactions, and any and all costs of maintaining, terminating and/or reestablishing any hedge or related trading positions or transactions (and discounted to present value or bearing interest, as appropriate), in each case as determined by Seller in a commercially reasonable manner, as well as the costs of storing, transporting or disposing of the Product quantities not purchased by Buyer and any related administrative and legal fees. Buyer further acknowledges that Seller shall not be obligated to perform any or Seller's obligations hereunder if there is an event of default or another breach by Seller's physical supplier with respect to Seller's purchase and sale agreement with such physical supplier.

**11.** **INDEMNITY:** Buyer shall defend, indemnify and hold Seller and any of Seller's agents or representatives harmless with respect to any and all liability, loss, claims, expenses, or damage suffered or incurred by reason of, or in any way connected with, the acts, omissions, fault or default of Buyer or its agents or representatives in the purchase, receipt, use, storage, handling or transportation of the Products in connection with each Transaction.

**12.** **FORCE MAJEURE CONTINGENCIES:**

**(a)** Seller shall not be in breach of its obligations under any Transaction in the event that performance is prevented, delayed, or made substantially more expensive as a result of any one or more of the following contingencies, whether or not such contingency may have been foreseen or foreseeable at the time of contracting and regardless of whether such contingency is direct or indirect:

**(i)** labor disturbance, whether involving the employees of Seller, Supplier or otherwise, and regardless of whether the disturbance could be settled by acceding to the demands of the labor group;

**(ii)** compliance with applicable law or a change, request or order of any governmental authority or agent;

**(iii)** shortage in raw material, transportation, manufacturing, or fuels from Seller's contemplated source of supply;

The World Fuel Services
Marine Group of Companies
General Terms and Conditions



**12.** **FORCE MAJEURE CONTINGENCIES (continued):**

**(iv)** any other cause beyond the reasonable control of Seller, whether or not foreseeable; or

**(v)** any determination, at Seller's sole discretion, that proceeding with a delivery would be a violation of the sanctions laws or regulations of the United States or any other jurisdiction to which Seller may be subject.

**(b)** In the event that performance is prevented or delayed by such a contingency, Seller may reduce deliveries in any manner as it may determine in its sole discretion.

**(c)** If performance is made substantially more expensive by such a contingency, Seller shall have the option either to reduce or stop deliveries or to continue deliveries and increase prices in fair proportion to the increased cost of operation under such a contingency.

**(d)** Seller shall not be liable for demurrage or delay resulting from any of the foregoing contingencies.

**(e)** Quantities not sold or purchased due to the occurrence of such a contingency may be reduced or eliminated from the contractual amount at the discretion of Seller.

**(f)** Nothing in this provision shall be deemed to excuse Buyer from its obligation to make payments for Products received.

**13.** **TAXES AND ASSESSMENTS:**

**(a)** Buyer will pay Seller the amount of all excise, gross receipts, import, motor fuel, superfund and spill taxes, and all other federal, state and local taxes (collectively, "Taxes and Assessments") or the foreign equivalent as determined in the sole, absolute and unfettered discretion of Seller (other than taxes on income), and paid or incurred by Seller directly or indirectly with respect to the Products and/or on the value thereof insofar as the same are not expressly included in the price quoted. Any additional Taxes and Assessments incurred by Seller arising from a Transaction and imposed by any governmental and/or any regulatory authority after delivery as a result of an audit, whether domestic and/or international, shall be borne solely by Buyer.

**(b)** Buyer will present Seller with any required documentation, including, but not limited to, registrations, exemptions, certifications, claims, refunds, declarations or otherwise, in a form and format, and on or before whatever due date Seller shall require, to satisfy Seller's concerns in connection with any of the above taxes or assessments. Further, Buyer shall indemnify and hold Seller harmless for any damages, claims, liability or expense Seller might incur due to Buyer's failure to comply with this requirement.



The World Fuel Services
Marine Group of Companies
General Terms and Conditions

**14.** **SAFETY AND ENVIRONMENTAL PROTECTION:**

**(a)** It shall be the sole responsibility of Buyer to comply and advise its personnel, agents and/or customers to comply, both during and after delivery, with all the health and safety requirements applicable to the Products and to ensure so far as possible that any user of such Products avoids, without limitation, any frequent or prolonged contact with the Products. Seller accepts no responsibility for any consequences arising from failure to comply with such health and safety requirements or arising from such contact. Buyer shall protect, indemnify and hold Seller harmless against any damages, expense, claims or liability incurred as a result of Buyer, or any user of the Products, or its customers failing to comply with the relevant health and safety requirements.

**(b)** In the event of a spill or discharge occurring before, during or after bunkering, Buyer shall immediately notify the appropriate governmental authorities and take whatever action is necessary, and pay all costs to effect the clean-up. Failing prompt action, Buyer authorizes Seller and Supplier, if any, to conduct such clean- up on behalf of Buyer at Buyer's risk and expense, and Buyer shall indemnify and hold Seller and Supplier, if any, harmless against any damages, expense, claims or liability arising out of any such spill or clean-up unless such spill or clean-up shall be proven to be wholly and solely caused by Seller's gross negligence.

**(c)** Buyer warrants that the Receiving Vessel is in compliance with all governmental, port/terminal and pollution rules and regulations. The Receiving Vessel will not be moored at a wharf or alongside other marine loading facilities of Seller or Supplier unless free of all conditions, deficiencies or defects which might impose hazards in connection with the mooring, unmooring or bunkering of the Receiving Vessel.

**15.** **ADDITIONAL PROVISIONS**

**(a)** Claims, notices and other communications hereunder shall be in writing and shall be mailed via certified or registered mail or by overnight courier to the attention of the particular Seller in each Transaction at the following address: 9800 N.W. 41st Street, Suite 400, Miami, Florida 33178, USA. Unless otherwise indicated by Buyer, notices hereunder shall be mailed, faxed and/or e-mailed to Buyer at the address designated by Buyer for invoicing. Either Buyer or Seller may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it by giving fifteen (15) days prior written notice of its new address to the other party.

**(b)** No waiver of any of the provisions hereof shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver of any breach.

The World Fuel Services
Marine Group of Companies
General Terms and Conditions



**15.** **ADDITIONAL PROVISIONS (continued):**

**(c)** A failure or delay in exercising any right, power or privilege in respect of these General Terms or any Transaction will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

**(d)** Buyer shall not assign or transfer any right or delegate any obligation, in whole or in part, arising under a Transaction without the prior written consent of Seller.

**(e)** If any part of the General Terms is deemed invalid, all other conditions and provisions hereof shall remain in full force as if the invalid portion had never been part of the original agreement.

**(f)** The headings used herein are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting these General Terms.

**(g)** Neither these General Terms, nor any Confirmation, shall be altered or amended except by an instrument in writing signed by or on behalf of Seller. Seller may amend these General Terms from time to time without advance notice to Buyer. Any such amendment shall be effective and apply with respect to all Transactions for which a Confirmation is sent after the effective date of the amended General Terms.

**(h)** No ambiguity in any provision of these General Terms or any Confirmation shall be construed against a party by reason of the fact it was drafted by such party or its counsel. Acceptance of, or acquiescence in, a course of performance rendered under these General Terms or any Confirmation shall not be relevant or admissible to determine the meaning of the General Terms or any Confirmation, even though the accepting or acquiescing party has knowledge of the nature of the performance and an opportunity to make objection. The General Terms shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, legal representatives, and successors.

**16.** **WAIVER OF IMMUNITIES:** Buyer expressly and irrevocably waives and agrees not to assert such a defense in any action or proceeding, which may be commenced or asserted against Buyer or Buyer's revenues and/or assets in connection with a Transaction to the fullest extent permitted by applicable law, with respect to Buyer and Buyer's revenues and/or assets (irrespective of their use or intended use), all immunity on the grounds of sovereign immunity or other similar grounds, where Buyer is a state or government owned or controlled entity, whether in whole or in part or otherwise, which status would otherwise entitle Buyer to assert or allege the defense of sovereign immunity in any claim against it from:

**(a)** suit;

**(b)** jurisdiction of any court;



## The World Fuel Services
## Marine Group of Companies
## General Terms and Conditions

**16.** **WAIVER OF IMMUNITIES (continued):**

**(c)** relief by way of injunction, order for specific performance or for recovery of property;

**(d)** attachment of Buyer's assets (whether before or after judgment); or

**(e)** execution or enforcement of any judgment to which Buyer or Buyer's revenues and/or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings.

**17.** **COMPLIANCE WITH APPLICABLE LAWS:**

Each party represents and warrants to the other that at all times during the term of this Agreement it will comply with all laws and shall obtain all appropriate government approvals applicable to the performance of its obligations under this Agreement.

Notwithstanding the generality of the foregoing:

**(a)** Each party represents and warrants to the other that at all times during the term of this Agreement: (1) it is knowledgeable about Anti-Bribery Laws applicable to the performance of its obligations under this Agreement and will comply with all such Anti-Bribery Laws; (2) neither it nor, to its knowledge, any director, officer, agent, employee or other person acting on its behalf, has made, offered or authorized, or will make, offer or authorize, either directly or indirectly, any unlawful payment, gift, promise or other advantage related to this Agreement; and (3) it has instituted and maintains policies and procedures designed to ensure continued compliance with Anti-Bribery Laws applicable to its performance under this Agreement, including, but not limited to, the maintenance of accurate books and records. Regardless of whether they may be directly applicable to a party, as a minimum, "Anti-Bribery Laws" means the United States Foreign Corrupt Practices Act of 1977 and the United Kingdom Bribery Act 2010 (each as amended from time to time) and all other applicable national, regional, provincial, state, municipal or local laws and regulations that prohibit the bribery of, or the providing of unlawful gratuities or other benefits to, any government official or any other person.

**(b)** Each party represents and warrants to the other that at all times during the term of this Agreement: (1) it is knowledgeable about Trade Laws applicable to the performance of its obligations under this Agreement and will comply with all such Trade Laws; (2) except as authorized or otherwise not prohibited under the terms of any applicable Trade Laws, neither it, nor any of its subsidiaries or, to its knowledge, any director, officer, employee, agent, or affiliate, is an individual or entity ("Person") that is or is owned or controlled by Persons that are (i) the subject of Trade Laws, or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Trade Laws; (3) it obtains and maintains all certifications, credentials, authorizations, licenses and permits necessary to perform under this Agreement in compliance with all applicable Trade Laws; and (4) it has instituted and maintains policies and procedures designed to ensure



## The World Fuel Services
## Marine Group of Companies
## General Terms and Conditions

**17.** **COMPLIANCE WITH APPLICABLE LAWS (continued):**

**(b)** continued compliance with all Trade Laws applicable to its performance under this Agreement, including, but not limited to, the maintenance of accurate books and records. Regardless of whether they may be directly applicable to a party, as a minimum, "Trade Laws" includes all sanctions, embargoes, or other trade restrictions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC", including the OFAC Specially Designated Nationals List ("SDN List")), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or any other applicable authority or regulatory body.

**(c)** Notwithstanding any other clause of this Agreement, either party may terminate this Agreement immediately upon written notice to the other party at any time, if, in its reasonable judgment, the other party is in breach of any of the representations and warranties in sub-clauses (a) or (b) of this clause.

**18.** **LAW, VENUE AND JURISDICTION; WAIVER OF JURY TRIAL:** These General Terms and each Transaction shall be governed by the general maritime law of the United States of America, the applicable federal laws of the United States of America, and, in the event that such laws are silent on the disputed issue, the laws of the State of Florida, without reference to any conflict of laws rules which may result in the application of the laws of another jurisdiction. The General Maritime Law and the applicable federal laws of the United States of America shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Any disputes concerning quality or quantity shall only be resolved in a court of competent jurisdiction in Miami- Dade County, Florida. Disputes over payment and collection may be resolved, at Seller's option, in the Miami-Dade, Florida state or federal courts or in the courts of any jurisdiction where either the Receiving Vessel or an asset of Buyer may be found. Each of the parties hereby irrevocably submits to the jurisdiction of any such court, and irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum or its foreign equivalent to the maintenance of any action in any such court. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any country where it finds the vessel. **BUYER AND SELLER WAIVE ANY RIGHT EITHER OF THEM MIGHT HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING FROM OR RELATED TO THESE GENERAL TERMS OR ANY TRANSACTION.**

**EXHIBIT C**

**Subject:**     {CONFIRMATION: GENTLE SEAS / SINGAPORE / 3085148}

**Date:**        Tuesday, May 14, 2019 at 4:03:17 AM Eastern Daylight Time

**From:**        Nanna Sinding Brage-Andersen

**To:**          REGINALDROBYN@24VISION.SOLUTIONS, VARUNGANESAN@24VISION.SOLUTIONS

**CC:**          Mark Tamsitt

**Attachments:** Worldfuelservices_logo.gif, Worldfuelservices_logo.gif



```
14-MAY-2019 08:02 GMT


++ Revised with final quantity ++


TO               : 24VISION CHARTERING SOLUTIONS DMCC
ATTENTION        : REGINALD ROBYN
                 : VARUN GANESAN
FROM             : WORLD FUEL SERVICES

WORLD FUEL SERVICES CONFIRMS you have placed following firm order:

VESSEL           : GENTLE SEAS

IMO or WFS Reference Number 9703514 (Included for reference purposes only)

PORT             : SINGAPORE
DATE             : 11-MAY-2019 TO 21-MAY-2019

SELLER           : WORLD FUEL SERVICES
                   A TRADE NAME/DIVISION OF WORLD FUEL SERVICES (SINGAPORE) PTE LTD
PAYMENT TERMS    : 45 DDD BY TT
BUYER            : MV GENTLE SEAS AND HER OWNERS/OPERATORS AND
                   24VISION CHARTERING SOLUTIONS DMCC

PHYSICAL         : KAIROS, ENGHUA
FUEL GRADE/SPEC  : 380CST/ISO 8217:2010:RMG380 MAX 3.5%S
QUANTITY         : 600.00 MTONS
PRICE            : USD 428.00 / MTONS  DELIVERED


* In the event of Buyer cancelling order, or under-lifting of quantity, for
  any reason, Buyer shall be responsible for standard cancellation fee,
  plus any difference between the contract price of any unlifted quantities
  and the amount received by Seller upon resale.

* MGO:  Please note that any MGO ordered at Singapore will meet DMA specs
  except for pour-point, which is typically 3-6 degrees C.

* GST [Singapore Goods & Services Tax]:
  It is the Buyer's responsibility to provide documentation via agent to
   prove that vessel is on an international voyage. If such documentation
  is not provided prior to bunkering, GST will be charged on entire
  sales amount.
```

It is the Buyer's responsibility to ensure that the BDN/Bunker Delivery
    Receipt is endorsed with vessel's stamp and signature of Master or Chief
    Engineer, to qualify for a zero-rated purchase in compliance with the
    Singapore Goods & Services Tax requirements. Failing this, GST will be
    charged on the entire sales amount.

*Delivery to be in accordance with Singapore Technical Reference 48 (TR 48) with Barge


* Overtime/demurrage/cancellation fees/other charges (if any) at cost for Buyer's acco

* Please ensure close coordination between agent/local supplier at all times

* Please inform us by return of any errors, omissions or changes in the above


All sales are on the credit of the vessel. Buyer is presumed to have authority
to bind the vessel with a maritime lien. Disclaimer stamps placed by the vessel
on the delivery receipt will have no effect and do not waive the Seller's lien.


This confirmation is governed by and incorporates by reference the Seller's Marine
Group of Companies General Terms and Conditions for the sale of marine fuel
products and related services, including the law and jurisdiction clause therein,
in effect as of the date that this confirmation is issued, unless alternative
terms and conditions have been prior agreed in writing by an authorised
representative of the Seller. The Seller's Marine Group of Companies General
Terms and Conditions can be found at:
https://www.wfscorp.com/Marine/pdf/Marine-Terms.pdf


Notwithstanding any other terms and conditions that may have been agreed in
writing between the parties, each party represents and warrants to the other
that at all times during the term of this Agreement it will comply with all
laws and shall obtain all appropriate government approvals applicable to
the performance of its obligations under this Agreement.

Notwithstanding the generality of the foregoing:

(a) Each party represents and warrants to the other that at all times
during the term of this Agreement:

(1) it is knowledgeable about Anti-Bribery Laws applicable to the performance of all
obligations under this Agreement and will comply with all such Anti-Bribery Laws;

(2) neither it nor, to its knowledge, any director, officer, agent, employee or other
person acting on its behalf, has made, offered or authorized, or will make, offer or
authorize, either directly or indirectly, any unlawful payment, gift, promise or other
advantage related to this Agreement; and

(3) it has instituted and maintains policies and procedures designed to ensure continu
compliance with Anti-Bribery Laws applicable to its performance under this Agreement,
including, but not limited to, the maintenance of accurate books and records. Regardle
of whether they may be directly applicable to a party, as a minimum, "Anti-Bribery Law
means the United States Foreign Corrupt Practices Act of 1977 and the United Kingdom
Bribery Act 2010 (each as amended from time to time) and all other applicable national
regional, provincial, state, municipal or local laws and regulations that prohibit the
bribery of, or the providing of unlawful gratuities or other benefits to, any governme
official or any other person.

(b) Each party represents and warrants to the other that at all times during the term of this Agreement:

(1) it is knowledgeable about Trade Laws applicable to each party to this Agreement and will perform this Agreement such that each party remains in full compliance with all applicable Trade Laws (currently Iran, Cuba, Syria, North Korea and the Crimea Region of Ukraine);

(2) except as authorized or otherwise not prohibited under the terms of any applicable Trade Laws, neither it, nor any of its subsidiaries or, to its knowledge, any director officer, employee, agent, or affiliate, is an individual or entity ("Person") that is or is owned or controlled by Persons that are (i) the subject of Trade Laws, or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Trade Laws;

(3) it obtains and maintains all certifications, credentials, authorizations, licenses and permits necessary to perform under this Agreement in compliance with all applicable Trade Laws; and

(4) it has instituted and maintains policies and procedures designed to ensure continued compliance with all Trade Laws applicable to the performance of this Agreement, including, but not limited to, the maintenance of accurate books and records. Regardless of whether they may be directly applicable to a party, as a minimum, "Trade Laws" includes all sanctions, embargoes, or other trade restrictions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC", including the OFAC Specially Designated Nationals List ("SDN List")), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or any other applicable authority or regulatory body (which currently includes Iran, Cuba, Syria, North Korea and the Crimea Region of Ukraine.)

(c) Each party represents and warrants to the other that at all times during the term of this Agreement:

(1) it is knowledgeable about Labor Laws applicable to the performance of all obligations under this Agreement and will comply with all such Labor Laws;

(2) it has instituted and maintains policies and procedures designed to ensure continued compliance with Labor Laws applicable to its performance under this Agreement, including, but not limited to, the maintenance of accurate books and records. Regardless of whether they may be directly applicable to a party, as a minimum, "Labor Laws" means the UK Modern Slavery Act 2015 and the United Nations Universal Declaration of Human Rights and all other applicable national, regional, provincial, state, municipal or local laws and regulations that (i) prohibit the use of forced or child labor, discrimination, harassment, abuse, or retaliation in their work place, and (ii) require providing wages, benefits, and working hours that meet or exceed the applicable legal standards and regulations.

(d) Notwithstanding any other clause of this Agreement, either party may terminate this Agreement immediately upon written notice to the other party at any time if, in its reasonable judgment, the other party is in breach of any of the representations and warranties in sub-clauses (a), (b), or (c) of this clause.

For changes please contact: Sinding Brage-Andersen, Nanna at NBrage@wfscorp.com

Authorized signatory for the World Fuel Services entity stated above,

BEST REGARDS
MARK TAMSITT

MSG#: 3085148

**EXHIBIT D**



# ENG HUA COMPANY (PTE) LIMITED

Co. Reg. No. 196600786D Bunker Supplier's License no. 91844
1 Coleman Street #05-05
The Adelphi Singapore 179803
Tel: 6346 1191 Fax: 6440 7732

## BUNKER DELIVERY NOTE

BDN No. 190400

| | | |
|---|---|---|
| Port | : | SINGAPORE |
| Delivery Location | : | AESPA |
| Bunker Tanker's Name | : | FRIENDSHIP |
| SB No. | : | 581 H |
| Alongside Vessel | : | 18 05 19    1130 |
| | | (Date / Time) |
| Commenced Pumping | : | 18 05 19    1413 |
| | | (Date / Time) |
| Completed Pumping | : | 18 05 19    1630 |
| | | (Date / Time) |

| | | |
|---|---|---|
| Bunker Metering Ticket No | : | 533 |
| Date | : | 18 05 19 |
| Vessel's Name | : | GENTLE SEAS |
| Vessel's IMO No. | : | 9703514 |
| Gross Tonnage | : | 35812 |
| Owner / Operator | : | MASTER & OWNER |
| ETD | : | 18 05 19 |
| Next Port | : | SOUTH AFRICA |

## PRODUCT SUPPLIED

| | | | |
|---|---|---|---|
| Product Name | MF0380CST | Flash Point ºC (ISO 2719) | 75.0 |
| Viscosity @ 40ºC or 50ºC mm²/s (ISO 3104) | 374.8 | Sulphur Content % m/m (ISO 14596 or ISO 8754) | 3.41 |
| COQ* density at 15ºC kg/m³ (ISO 3675 or ISO 12185) | 0.9908 | | |
| Water Content % V/V (ISO 3733) | 0.40 | Metric Tons Delivered | 598.966 |

| SUPPLIER'S DECLARATION | MASTER'S / CHIEF ENGINEER'S ACKNOWLEDGEMENT |
|---|---|
| **Declaration that bunker fuel supplied conforms with MARPOL Annex VI** We declare that the bunker fuel supplied conforms with Regulation 18.3 of this Annex and that the sulphur content of the fuel oil supplied does not exceed: Please mark (x) in the applicable box(es) below. [X] the limit value given by Regulation 14.1 of this Annex; [ ] the limit value given by Regulation 14.1 of this Annex; or [ ] the purchaser's specified limit value of ____ (%m/m), as completed by the fuel oil supplier's representative and on the basis of the purchaser's notification that the fuel oil is intended to be used: 1. in combination with an equivalent means of compliance in accordance with Regulation 4 of this Annex; or 2. is subject to a relevant exemption for a ship to conduct trials for sulphur oxides emission reduction and control technology research in accordance with Regulation 3.2 of this Annex. | We acknowledge receipt of the above product and confirm its intended use and that the following samples were jointly taken by the continuous drip sampler at the vessel's manifold, sealed and numbered: |

| | Seal No. | Counter Seal No. (if any) |
|---|---|---|
| Vessel: | 130831 130832 (MARPOL) (B1) (B2) | 153596  2342089 153597  2342090 (B1) (B2) |
| Bunker Tanker: | 130833 130834 | 153598  2342088 |
| Surveyor: | (S1) 130835 | (S1) 153599 / 153600 (S2) |
| Other: | (LAB) 130836 | 2342087 |
| | (To specify) | (To specify) |

Was a copy of SDS received?  (Yes) / No

For    AS ABOVE

Company's Name and Stamp

Signature of Cargo Officer
**WONG TAT SENG**

Full Name in Block Letters

REMARKS    NIL

Was a Note of Protest issued?    Yes / No

### CUSTOMER FEEDBACK

The following rating is satisfaction level of the bunkering operation (Please Circle);

1    2    3    4    (5)

Very Unsatisfied                    Very Satisfied

Acknowledged by    18 05 19
1735 HRS

Signature of Master / Chief Engineer / Date and Time

Full Name in Block Letters

Vessel's Stamp

*The COQ (Certificate of Quality) Density stated above is for fuel specification only and not for transfer quantity determination.

**EXHIBIT E**

```
*****ORIGINAL*****
BUNKER METERING TICKET
```

Vessel ID:
FRIENDSHIP
SB 0581H
System ID:
K6000424430

BTN.:
533 / HFO

Printout Time:
2019/MAY/18 16:30:56

Start Time:
2019/MAY/18 14:13:44

End Time:
2019/MAY/18 16:30:44

Totalizer Loading
at Operation Start:
331216.556 t (in air)

Totalizer Loading
at Operation End:
331216.561 t (in air)

Totalizer Delivery
at Operation Start:
341649.003 t (in air)

Totalizer Delivery
at Operation End:
342247.869 t (in air)

Mass DELIVERED:
598.866 t (in air)

Signatures:

Chief Engineer: ............

Cargo Officer: ............



***ATTACH THIS TICKET TO
BDN***

All times GMT+08:00 Kuala Lumpur, Singapore

**EXHIBIT F**

Case 1:20-cv-23288-KMW   Document 1-5   Entered on FLSD Docket 08/06/2020   Page 7 of 8

**WORLD FUEL SERVICES**

**TAX INVOICE**

A TRADE NAME/DIVISION OF WORLD FUEL SERVICES (SINGAPORE) PTE LTD
238A THOMSON ROAD # 08-01/10 NOVENA SQUARE TOWER A
SINGAPORE 307684  Co Registration no: 199501485M
GST# M2-8920852-6

| CUSTOMER NO. | INVOICE NO. | INVOICE DATE | PAGE NO. |
|---|---|---|---|
| 471377 | 309549-31501 | 27-MAY-19 | 1 - 1 |

Tel: 65-6215-6999 Fax: 65-6215-6902
Internet: www.wfscorp.com

**WIRE TRANSFER FUNDS TO:**
Bank of America N.A. NEW YORK, NY
SWIFT: BOFAUS3N
FedWire ABA: 026009593
ACH ABA: USABA
ACCT: World Fuel Services Europe, Ltd
ACCT# 5800678517
ALL BANK CHARGES ARE FOR SENDERS ACCOUNT

M/V GENTLE SEAS AND/OR HER OWNERS/OPERATORS AND
24VISION CHARTERING SOLUTIONS DMCC
OFFICE 53 - 5TH FLOOR, ONE JLT
JUMEIRAH LAKES TOWER
UNITED ARAB EMIRATES

| TERMS |
|---|
| 45 DDD BY TT |

| DUE DATE |
|---|
| 02-JUL-19 |

| LIFT DATE | BDR NO. | ORDER NO. | CONTRACT NO. | PO NO. |
|---|---|---|---|---|
| 18-MAY-19 | 190400 | N/A | N/A | 3085148 |

| VESSEL | PORT | COUNTRY | DESTINATION | ITEM NO. |
|---|---|---|---|---|
| GENTLE SEAS | SINGAPORE | SINGAPORE | HIGH SEAS PACIFIC OCEAN | N/A |

| DESCRIPTION | QUANTITY | UNIT PRICE | EXTENDED AMOUNT | | TAX AMOUNT | | INVOICE AMOUNT |
|---|---|---|---|---|---|---|---|
| | | | SGD | USD | SGD | USD | USD |
| 380CST / RMG380 MAX 3.5%S(10) | 598.9660 MTN | 428.00000 USD/MTN | 353,055.48 | 256,357.45 | 0.00 | 0.00 | 256,357.45 |
| | | | 353,055.48 | 256,357.45 | 0.00 | 0.00 | 256,357.45 |

COMMENTS
GST 0%

This transaction is subject to the terms and conditions of sale set forth at www.wfscorp.com/MarineIndex.jsp
WE WILL ASSUME THIS INVOICE TO BE CORRECT UNLESS WE RECEIVE WRITTEN NOTICE FROM YOU WITHIN 14 DAYS FROM THE INVOICE DATE.
A CHARGE OF 2% PER MONTH PRO RATA WILL BE APPLIED ON AMOUNTS PAST DUE.

Please note that World Fuel Services is consolidating its brands. As a result, you may notice that the brand name or logo changes on certain documents. Rest assured that this branding change does not change the legal entity. The legal entity you are contracted to work with will remain your contractual partner at all times.

| MAIL INSTRUCTIONS | EXCHANGE RATE | COUNTRY SEQUENCE NO. | CUSTOMER PO NO. | PLEASE REMIT THIS AMOUNT | |
|---|---|---|---|---|---|
| REGULAR MAIL | 1.37720 SGD/USD | SG-31501-1905-154923 | N/A | USD | 256,357.45 |

6-Aug-20

***WORLD FUEL SERVICES (SINGAPORE) PTE LTD***
***TRADING AS WORLD FUEL SERVICES***
***Statement of Account***
As of August 6, 2020

M/V GENTLE SEAS AND/OR HER OWNERS/OPERATORS AND 24VISION CHARTERING SOLUTIONS DMCC

| INVOICE NUMBER | VESSEL SUPPLIED / PORT OF SUPPLY | DELIVERY DATE | DUE DATE | CUR | INVOICE AMOUNT | DAYS PAST DUE | PAYMENT AMOUNT | INTEREST DUE | 5% ADMIN FEE | TOTAL OWED |
|---|---|---|---|---|---|---|---|---|---|---|
| 309549-31501 | M/V GENTLE SEAS / SINGAPORE | 18-May-19 | 2-Jul-19 | USD | $   256,357.45 | 401 | $        - | $   50,695.56 | $   12,817.87 | $   319,870.89 |
| | TOTAL OUTSTANDING: | | | | $   256,357.45 | | $        - | $   50,695.56 | $   12,817.87 | $   319,870.89 |
| | | | | | | | | | | |

Please note that a 5% contractual administrative fee is charged on all amounts owed more than 15-days past due.
Interest is charged on a 1.5% per month pro rata basis.